UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FILED

05 MAR 11 PM 5: 12

UNITED STATES OF AMERICA,

       Plaintiff,

   v.

JOSEPH BARTHOLOMEW JR.,

       Defendant.

REPORT & RECOMMENDATION

04-CR-6168T

U.S. DISTRICT COURT
W.D.N.Y. ROCHESTER

## PRELIMINARY STATEMENT

By Order of Hon. Michael A. Telesca, United States District Judge, dated November 10, 2004, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 21).

On December 7, 2004, the government filed a single-count superseding indictment against defendant Joseph Bartholomew Jr. ("Bartholomew"), charging him with possession of a firearm after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Docket # 30).

Currently pending before this Court for a report and recommendation are Bartholomew's motions to suppress statements and tangible evidence.[1]  (Docket # 38).  For the following reasons, it is the recommendation of this Court that Bartholomew's motions be denied.

---

[1] Bartholomew's omnibus motion also sought, *inter alia*, discovery and inspection.  (Docket # 23).  This request was resolved in open court by the undersigned on December 9, 2004.  (Docket # 34).

## FACTUAL BACKGROUND

On December 30, 2004, this Court conducted an evidentiary hearing on Bartholomew's motions to suppress statements and tangible evidence.  Officer Christopher Mears of the Ogden Police Department testified on behalf of the government.  (Docket # 36).  No witnesses were called on behalf of the defense.

Officer Mears testified that on January 30, 2004, at approximately 9:30 p.m., he received a radio broadcast from the Monroe County Emergency Communications Department. (Tr. 7).[2]  The broadcast reported that the Orleans County Sheriff's Department was looking for an individual named "Joe Bartholomew" who was believed to be driving a black Cadillac Seville from the Orleans County area, possibly eastbound on Route 31A toward Route 531.  (Tr. 7). According to Mears, the broadcast also revealed that Bartholomew was wanted in Orleans County for a domestic assault against a child.  (Tr. 8).  Mears was close to Route 531 when he received the call, and he thereafter positioned his patrol vehicle so that he could monitor eastbound traffic on that road.

After several minutes, Mears testified, he observed a black Cadillac Seville. Mears followed the vehicle and contacted his dispatcher to request the license plate number of the car for which the Orleans County Sheriff's Department was searching.  (Tr. 7-8).  The dispatcher responded with a license plate number that matched that on the Cadillac observed by Mears.  (Tr.8).  Upon receiving such information, Mears activated his emergency lights.  The Cadillac then exited eastbound on Route 531 at the Manitou Road exit and came to a stop near

---

[2]  The transcript of the suppression hearing conducted before this Court on December 30, 2004, shall hereinafter be referenced as "Tr. __."  (Docket # 36).

2

the guardrail, approximately halfway up the exit ramp. According to Mears, the car was several

inches into the driving lane when it came to a stop. (Tr. 8). Mears stopped his patrol vehicle

approximately fifteen to twenty feet behind the Cadillac and radioed his dispatcher. (Tr. 12).

Mears then approached the driver's side of the vehicle and observed a white male driver as the

sole occupant. (Tr. 12). Mears asked the male for his driver's license and was provided with a

New York State photographic identification card bearing the name Joseph Bartholomew and a

photograph of an individual matching the driver. Mears asked the driver, later identified as

Bartholomew, whether he had a valid New York State driver's license, and Bartholomew

responded that he did not. Bartholomew explained that his license had been suspended for child

support deficiencies. (Tr. 12).

   Mears confirmed with his dispatcher that Bartholomew's driving privileges had

been revoked and then asked Bartholomew whether he had "had any problems in Orleans County

that evening" (Tr. 13). Bartholomew replied that he had, inquiring whether his wife or

girlfriend[3] had called the police and commenting, "I can't believe she did that." (Tr. 13-14).

Mears ordered Bartholomew to step out of the vehicle and conducted a pat-frisk, after which

Mears placed Bartholomew in the rear seat of his patrol car. (Tr. 14). At that point, Mears

confirmed through the computer in his vehicle that Bartholomew's driver's license had been

revoked. (Tr. 14).

   Mears arrested Bartholomew for driving without a license and determined that his

car would need to be towed because there was no one in the area to take custody of it and

---

[3] At the time of the suppression hearing, Officer Mears was unable to recall whether Bartholomew referred to a wife or to a girlfriend. (Tr. 13).

because it was in a hazardous location – partially blocking the driving lane of an off-ramp. (Tr. 16, 17, 45). Mears testified that his decision to tow the Cadillac also was based upon the written "General Orders" of the Ogden Police Department, which require the towing of vehicles incident to arrest that are illegally parked or parked in a hazardous manner. (Tr. 19, 48-49, Government's Ex. ("G.Ex.") 1).[4] According to Mears, the car was both parked illegally (because it extended over the fog line) and parked in a hazardous manner (because it was on an exit ramp from a controlled access highway at night).

According to Mears, he conducted an inventory search of the vehicle prior to its towing pursuant to General Order No. 511, which sets forth the Ogden Police Department's towing policies and procedures. (Tr. 15-16, 18, 21). He testified that the order required him to

---

[4] The government introduced General Order No. 511 pertaining to "Vehicle Towing," which provides in relevant part:

> Damaged or illegally parked vehicles shall be towed:
> 1) When necessary to maintain the flow of traffic
> 2) To correct a hazardous condition (i.e., blocking, etc.)
> 3) To provide access to a driveway after receipt of a citizen complaint
> 4) As illegally parked, and the officer determines it must be towed
> 5) When snowbound or parked on snow emergency routes during a declared snow emergency, or
> 6) As abandoned or junk vehicles parked on the street
> 7) When parked on a roadway and in violation of Vehicle and Traffic Laws and statutes
> 8) As determined by the reporting officer for purposes of liability, safety, or other appropriate reasons
>
> In situations incidental to arrest, vehicles shall only be towed for safekeeping, evidence processing, or if they are illegally parked, blocking, or hazardous.
>
> In all towing situations, officers shall:
> [I]nspect the vehicle's compartments and open any closed containers whose contents can not be ascertained from examining the containers['] exterior. Remove any loose articles of value prior to towing. These articles shall be inventoried on a Property Custody Report and delivered to the Property Office. Each officer is advised to conduct a thorough inventory of each vehicle.

(G.Ex. 1).

secure any items of value or items that posed a public safety hazard prior to towing. (Tr. 22).

During the search, Mears lifted the armrest between the driver's and front passenger's seats and

discovered a box of 12-gauge shotgun shells. Based upon such discovery, Mears testified that he

believed a possibility existed that a firearm might be located within the vehicle. Mears returned

to his patrol car and asked Bartholomew whether there were any firearms in the Cadillac. (Tr.

15-16). Bartholomew replied, "Yes, there's a shotgun in the trunk." (Tr. 15). Mears then asked

Bartholomew whether he was a convicted felon, to which Bartholomew initially responded that

he was not. A few moments later, however, Bartholomew stated, "Yes, but that was a long time

ago." (Tr. 15).

      Mears testified that his question regarding Bartholomew's felony status was

relevant to the potential return of the shotgun. Specifically, Mears stated that he intended to

seize the shotgun prior to towing the Cadillac and assumed that Bartholomew at some point

might seek to retrieve it. Before releasing a firearm to an individual, Mears testified, the Ogden

Police Department must determine whether that person has ever been convicted of a felony. If

so, the firearm cannot be released without additional documentation. (Tr. 24). Thus, Mears

testified, he questioned Bartholomew regarding his felony status "as a kind of lead in to what I

was – how I was going to dispose of this weapon, what the disposition would be." (Tr. 24).

      Mears also questioned Bartholomew concerning his use of the shotgun, to which

Bartholomew replied that he used it for hunting. (Tr. 24-25). Mears doubted the veracity of

Bartholomew's response because the traffic stop occurred in January, which, according to Mears,

is not shotgun hunting season for any animal. (Tr. 25). Mears further doubted Bartholomew's

statement because, in his experience as a hunter, 12-gauge shells are not used for hunting rabbits. (Tr 25).

Mears then opened the trunk of the Cadillac and found a shotgun and six additional shotgun shells. After seizing the items, Mears transported Bartholomew to the Ogden Police Department. On the way, Mears asked Bartholomew whether he had any paperwork permitting him to possess the shotgun despite his felony conviction.[5] (Tr. 50). Mears testified that his questions to Bartholomew concerning the firearm were not investigatory in design, but rather addressed his concern for public safety and the eventual disposition of the shotgun. (Tr. 16, 40). Mears further testified that at no time during his questioning did he advise Bartholomew of his *Miranda* warnings. (Tr. 40).

## REPORT AND RECOMMENDATION

Bartholomew moves to suppress the shotgun and ammunition seized from the Cadillac on December 30, 2004, as well as statements made by him on that date. (Docket # 23). The government contends that the evidence was seized pursuant to a proper inventory search following Bartholomew's lawful arrest. (Docket # 28).

A. **Traffic Stop:** Bartholomew argues summarily that Officer Mears lacked reasonable suspicion to conduct the initial traffic stop of the black Cadillac. (Docket # 23 at 2). As the Second Circuit has observed, an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment. *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.)

---

[5] The record does not reflect whether Bartholomew responded to Mears's question.

6

(citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994). A

traffic stop must be justified by "probable cause or a reasonable suspicion, based on specific and

articulable facts, of unlawful conduct." *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 729

(4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994) and *citing Terry v. Ohio*, 392 U.S. 1, 30

(1968) (police officer may lawfully conduct brief stop and frisk for weapons, in the absence of

probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in

light of his experience that criminal activity may be afoot and that the persons with whom he is

dealing may be armed and presently dangerous")); *see also Knowles v. Iowa*, 525 U.S. 113, 117

(1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest). Evidence

seized as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree

doctrine" and may be suppressed. *United States v. Scopo*, 19 F.3d at 781 (quoting *United States

v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

On a motion to suppress, the defendant bears the initial burden of establishing that

a government official acting without a warrant subjected him to a search or seizure. *United

States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S.

917 (1981); *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*,

921 F. Supp. 211, 213 (S.D.N.Y. 1996). Once the defendant has met this burden, the burden then

shifts to the government to demonstrate by a preponderance of the evidence, *United States v.

Bayless*, at 213, that the search or seizure did not violate the Fourth Amendment. *United States

v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st

Cir.1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon

the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394

7

U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988). Here, the parties do not dispute that Bartholomew was subjected to a warrantless seizure. The issue is whether such seizure was justified by reasonable suspicion to believe criminal activity was afoot.

A *Terry* stop is "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. at 25-26. Unlike a full "probable cause" search, a *Terry* protective search must be of a character that can be described as a "minimal intrusion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *see also United States v. Salazar*, 945 F.2d 47, 50 (2d Cir. 1991), *cert. denied*, 504 U.S. 923 (1992) (*Terry* protective search permits "necessary measures to determine whether [suspect] is in fact carrying a weapon and to neutralize the threat of physical harm").

In determining whether a *Terry* stop was supported by reasonable suspicion, a court must take into account the totality of the circumstances viewed "through the eyes of a reasonable and cautious police officer on the scene [and] guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir.) (internal quotation omitted), *cert. denied*, 529 U.S. 1061 (2000). While "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted [the stop]," *Florida v. J.L.*, 529 U.S. 266, 271 (2000), the "[i]nformation known by one officer prior to a *Terry* stop is imputed to all officers who are involved in the investigative detention." *United States v. Hoskie*, 2000 WL 1052022, *4 (D. Conn. 2000); *see Illinois v. Andreas*, 463 U.S. 765, 771, n.5 (1983) (knowledge of one officer presumed to be shared by all involved in investigation).

In this matter, Mears testified that he received a broadcast over his police radio advising that the Orleans County Sheriff's Department was searching for an individual by the

8

name of "Joe Bartholomew" who was suspected of having committed a domestic assault against a child. (Tr. 7-8). The broadcast also reported that Bartholomew was believed to be driving a black Cadillac eastbound on Route 31A towards Route 531. (Tr. 7). After receiving the broadcast, Mears drove to Route 531 and positioned his patrol vehicle in order to monitor the eastbound traffic on that road. (Tr. 7). Several minutes later, Mears observed a black Cadillac matching the description previously provided. Mears followed the vehicle eastbound on Route 531, during which time he learned from his dispatcher that the license plate number of the car that Bartholomew was believed to be driving matched the Cadillac Mears was following. (Tr. 7-8).

On this record, I find that Mears had reasonable suspicion to justify the initial traffic stop of the black Cadillac. A reasonable officer in Mears's position, having heard the broadcast detailing that Bartholomew was suspected of assaulting a child and providing a description of his vehicle and likely location, and having observed a vehicle matching such description at the location specified, would have been reasonable in concluding that an investigative stop was warranted. Accordingly, Bartholomew's summary challenge to the lawfulness of the traffic stop should be rejected.

**B. Statements by Bartholomew:** Having determined that Mears was justified in conducting a traffic stop of the Cadillac, this Court must now address the statements made by Bartholomew during that stop.

Bartholomew does not contest the statements made by him while he was still in the Cadillac in response to Mears's questions whether he had a valid driver's license and whether

he had had "any problems" that night.[6]  (Docket # 38 at 2).  Bartholomew contends, however,

that his statements following Mears's third question – whether there were any firearms in the car

– violated his constitutional rights because he was not first advised of his rights under *Miranda v.

Arizona*, 384 U.S. 436 (1966).[7]  This third question, which occurred while Bartholomew was in

custody in Mears's patrol car, followed Mears's discovery of ammunition in the passenger

compartment of the car Bartholomew was driving.

In *Miranda*, the United States Supreme Court held that the government may not

use a defendant's statements that are the product of custodial interrogation unless it demonstrates

that the defendant was first warned of his Fifth Amendment privilege against self-incrimination

and then voluntarily waived that privilege.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  *See

also United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v.

Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).  Here, the government does

not contest that Bartholomew was in custody and subjected to interrogation by Mears.  It argues,

however, that Mears's questions fell within the public safety exception and thus did not require a

prior reading of the *Miranda* warnings.  (Docket # 28, 37).

In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court recognized the

public safety exception to *Miranda*, holding that *Miranda* need not be applied when law

---

[6]  In his post-hearing memorandum, Bartholomew states, "While the defense does not concede that reasonable suspicion or probable cause existed for the stop, it appears that once the stop was implemented that Officer Mears conducted a reasonable investigative inquiry based on the information available to him and that based upon the two initial oral admissions from Mr. Bartholomew, his lack of authority to operate the Cadillac Seville was immediately confirmed and his arrest occurred quickly."  (Docket # 38 at 2).

[7]  The government seeks only to introduce Bartholomew's statement, "Yea[h], there's a shotgun in the trunk."  The government does not seek to introduce the statements made by Bartholomew following this initial admission, that is, his statements concerning his prior criminal convictions and his use of the shotgun.

enforcement's questions reasonably arise from a concern for the public safety.  *Id.* at 656.  This

exception is rooted in the belief that "police officers can and will distinguish almost instinctively

between questions necessary to secure their own safety or the safety of the public and questions

designed solely to elicit testimonial evidence from a suspect."  *Id.* at 658-59.

       In *Quarles*, law enforcement officers were approached by a woman who reported

that she had just been raped by a black male, approximately six feet tall, who was wearing a

black jacket with the name "Big Ben" printed in yellow letters on the back.  The woman further

stated that the male had entered a nearby supermarket and that he was carrying a gun.  One of the

officers thereafter entered the supermarket and observed the defendant, who matched the

description given by the victim.  The defendant, realizing that the officer was there, turned and

ran.  The officer stopped the defendant at gunpoint in the rear of the store and conducted a pat-

frisk.  During the frisk, the officer noticed that the defendant was wearing an empty shoulder

holster, and after handcuffing him, the officer asked the defendant where the gun was.  The

defendant replied by nodding in the direction of some empty cartons and stating, "the gun is over

there."  *Id.* at 651-52.  The officer then retrieved a loaded firearm from one of the cartons.

       The defendant challenged the admissibility of his response (and the admissibility

of the gun as the fruit of such response) on the grounds that he was not first advised of his

*Miranda* warnings.  The Supreme Court rejected such argument, finding that "[w]hatever the

motivation of individual officers . . . , the doctrinal underpinnings of *Miranda* [do not] require

that it be applied in all its rigor to a situation in which police officers ask questions reasonably

prompted by a concern for the public safety."  *Id.* at 657.  According to the Court, the officer's

immediate need to protect the public safety by ascertaining the location of the firearm that he

believed the defendant had discarded outweighed the need for the prophylactic rule embodied in

*Miranda. Id.* at 657; *see United States v. Brady*, 819 F.2d 884, 888 (9th Cir. 1987) (officer's

question regarding whether there was a gun in the car fell under *Miranda* exception because it

arose from concern for public safety and not from a desire to obtain incriminating evidence),

*cert. denied*, 484 U.S. 1068 (1988).

   Standing at the opposite end of the spectrum is the Supreme Court's decision in

*Orozco v. Texas*, 394 U.S. 324 (1969).  In *Orozco*, the defendant had been involved in an

altercation outside of a restaurant in Dallas, Texas.  During such altercation, the defendant shot

and killed the victim.  Fleeing the scene, the defendant returned to his boardinghouse and went to

sleep.  Several hours later, the police arrived at the boardinghouse and were directed to the

defendant's room, where they placed him "under arrest."  394 U.S. at 325.  Without advising the

defendant of his *Miranda* warnings, the officers asked him whether he owned a gun.  The

defendant admitted that he did and indicated that it was hidden in the washing machine at the

boardinghouse.  *Id.* at 325.  A gun was thereafter recovered from the washing machine, and

ballistics tests indicated that the fatal shot had been fired from that weapon.  At trial, the

prosecution elicited testimony regarding the defendant's admission, and the defendant was

convicted of murder.  *Id.* at 326.  The Supreme Court reversed the conviction, holding, "the use

of [the defendant's] admissions obtained in absence of the required [*Miranda*] warnings was a

flat violation of the Self-Incrimination Clause of the Fifth Amendment."  *Id.* at 326.

   The challenge for this Court is to determine where on the spectrum between

*Quarles* and *Orozco* this case fits.  My determination that Mears's question to Bartholomew was

in fact justified by his concern for his own and the public's safety is aided by the Eighth's Circuit

12

decision in *United States v. Williams*, 181 F.3d 945 (8th Cir. 1999).  In *Williams*, law enforcement agents executed a search warrant for the defendant's apartment related to alleged narcotics trafficking.  The officers knew at the time of the execution that the defendant had a previous arrest for weapons possession.  At the time of entry, the defendant was found lying in bed, and he was immediately handcuffed.  The defendant was then placed in an upright position and informed that a search was to be conducted of his apartment.  Without advising the defendant of his *Miranda* warnings, one of the officers asked him, "[I]s there anything we need to be aware of?"  *Id.* at 948.  The defendant responded by indicating that there was a gun in the closet.  The officers then searched the closet and located the gun, along with ammunition and narcotics paraphernalia.  *Id.*

The defendant challenged the admissibility of his statement on the grounds that it was coerced and obtained in violation of his Fifth Amendment right against self-incrimination. *Id.* at 953.  The Eighth Circuit rejected his contention, finding the statement admissible under the public safety exception to *Miranda* because it was "reasonably prompted by a concern for public safety."  *Id.* (internal quotation omitted).  According to the court, "[a]lthough [the defendant's] hands were cuffed behind his back when the officers asked him if they needed to be aware of anything else, the officers could not have known . . . whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way."  *Id.* at 953-54; *see United States v. Jones*, 154 F. Supp. 2d 617, 629-30 (S.D.N.Y 2001) (following discovery of ammunition in defendant's apartment in which young child was present, officer justified in questioning defendant whether there was a firearm in the apartment).

13

The mere invocation of the public safety exception does not, of course, automatically insulate a defendant's statements from suppression under the Fifth Amendment. *See United States v. Jones*, 154 F. Supp. 2d at 629 (public safety exception is not intended to "accord officers an automatic right to interrogate suspects simply because it is possible that firearms are present at the arrest scene"). There must exist an articulable and reasonable basis for the officer's belief that officer or public safety was at risk as a result of the possible presence of an undetected weapon. *Id.* ("In the context of searches for weapons, [the public safety] doctrine requires, at a minimum, that the authorities have some real basis to believe that weapons are present, and some specific reason to believe that the weapon's undetected presence poses a danger to the police or to the public"). I find in this case that Officer Mears's concern over public safety was reasonable and justified his inquiry to Bartholomew.

As outlined *supra*, in the course of an inventory search, Mears discovered shotgun shells in the passenger compartment of Bartholomew's car. Having discovered the ammunition, Mears was reasonable in concluding that a loaded firearm might also be present in the car. Of course, at that point Bartholomew was in custody and no other persons were present in the area. (Tr. 16). While any firearm would have been out of Bartholomew's reach, the inadvertent discovery of the firearm by either Mears or towing personnel could have presented a substantial risk. Mears was in the midst of an inventory search of the vehicle when he discovered the ammunition, after which the car was to be towed to an impound lot. As discussed more fully below, Mears reasonably believed that the inventory search was required by his department's standardized policies and procedures. In view of the impending search and towing, the risk that a

loaded weapon might be mishandled if discovered either by Officer Mears or by towing company employees justified Mears's question to Bartholomew.

Accordingly, I find that Mears's question whether there was a firearm in the car arose from a reasonable concern for his own and the public's safety and not from a desire to obtain incriminating evidence. I thus recommend that Bartholomew's motion to suppress his statement should be denied pursuant to the public safety exception to the *Miranda* requirement.

C. **Inventory Search**: Bartholomew also moves to suppress the shotgun and ammunition seized from the Cadillac during the traffic stop. Mears testified that after stopping the vehicle, it was parked on the exit ramp of Route 531. The car was located partially on the shoulder of the road, with several inches extending into the driving lane. (Tr. 8).

Following Bartholomew's arrest, Mears determined that the Cadillac would have to be towed because Bartholomew was not authorized to drive and no one else was present to remove it. (Tr. 17). According to Mears, towing was required because the car was illegally parked on an off-ramp to a controlled access highway and also posed a hazard to passing motorists. (Tr. 19, 48-49). Mears further testified that his decision to tow the vehicle was mandated by General Order No, 511, which requires towing of cars incident to arrest when they are illegally parked or parked in a hazardous manner. (Tr. 19, 48-49, G.Ex. 1).

Once Mears decided to have the Cadillac towed, he conducted an inventory search of the vehicle for purposes of securing items of value and potential safety hazards. (Tr. 19-20, G.Ex. 1). During his initial search, Mears discovered a box of ammunition under the arm-rest between the driver's and front passenger's seats. Following Bartholomew's further statement

15

that there was a shotgun in the trunk of the car, Mears discovered the shotgun in the trunk, as well as six additional rounds of ammunition. (Tr. 15, 25).

"[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). *See also United States v. Taddeo*, 724 F. Supp. 81, 85 (W.D.N.Y. 1989) (citing *Colorado v. Bertine*, 479 U.S. at 371), *aff'd*, 932 F.2d 956 (2d Cir. 1991). According to the Second Circuit, "[a]n inventory search pursuant to standardized procedures will be upheld unless there is a showing that the government acted in bad faith or searched the car for the sole purpose of investigation." *United States v. Arango-Correa*, 851 F.2d 54, 59 (1988) (citing *Colorado v. Bertine*, 479 U.S. at 372; *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976); *Cooper v. California*, 386 U.S. 58, 61-62 (1967)).

The court in *United States v. Taddeo*, 724 F. Supp. at 81, upheld a challenged inventory search on facts similar to those presented here. In that case, the defendant was arrested while driving a rental car. When he was removed from the car, the vehicle remained parked, at the onset of rush-hour traffic, in a bus lane. The arresting officers decided to impound the car because no one had accompanied the defendant and because it imposed an impediment to traffic. *Id.* at 86. Prior to such towing, an inventory search was performed and a firearm was discovered in the vehicle's trunk. Judge Larimer rejected the defendant's motion to suppress the firearm, finding that the search of the vehicle, including the trunk, was a lawful inventory search that had "complied with the *Bertine* requirement that inventories be conducted according to 'standardized criteria.'" *Id.* (citing *Colorado v. Bertine* 479 U.S. at 374 n.6) (upholding search of vehicle

16

because conducted pursuant to departmental regulations requiring that officer search vehicle

prior to towing)).

In this matter, Mears searched the Cadillac pursuant to the Ogden Police

Department General Order No. 511, which provides:

> In all towing situations, officers shall:
>
> [I]nspect the vehicle's compartments and open any closed
> containers whose contents cannot be ascertained from examining
> the containers['] exterior. Remove any loose articles of value prior
> to towing. These articles shall be inventoried on a Property
> Custody Report and delivered to the Property Office. Each officer
> is advised to conduct a thorough inventory of each vehicle.

(G.Ex. 1).

On these facts, I find that Mears's decision to tow and to search the Cadillac was

reasonable and complied with standardized departmental policy and procedures. Those policies

and procedures required that the car be towed because it posed a hazard to traffic on the off-ramp

of a controlled access highway and was illegally parked. The order further required that an

inventory search of the vehicle be performed prior to such towing and that items of value be

identified in a property custody report. (G.Ex. 1). In compliance with this order, and not for

investigative or bad faith purposes, Mears arranged for the Cadillac to be towed and performed a

full inventory search, recording on a property custody report three items seized from the vehicle –

a purse belonging to a third party and a shotgun and ammunition. (Tr. 21-22).

I further find that, despite Bartholomew's arguments to the contrary, Mears's

search of the Cadillac's trunk was within the scope of the authorization provided by General

Order No. 511. The order provides that officers performing an inventory search "inspect the

vehicle's compartments and open any closed containers." (G.Ex. 1).  Mears testified that his

search of the trunk was conducted pursuant to this provision.  (Tr. 21).  *See, e.g., United States v.*

*Little*, 945 F. Supp. 79, 84 (S.D.N.Y. 1996) ("inventory search would have included the trunk of

the car"), *aff'd*, 133 F.3d 908 (2d Cir. 1998); *United States v. Gordon*, 1996 WL 112205, *4

(S.D.N.Y. 1996) (finding inventory search of trunk proper because police authorized to search

"closed containers") (citing *Colorado v. Bertine*, 479 U.S. at 374), *aff'd*, 107 F.3d 5 (1997), *cert.*

*denied*, 522 U.S. 841 (1997); *United States v. Taddeo*, 724 F. Supp. at 82, 86 (denying motion to

suppress evidence seized from trunk during inventory search); *United States v. Callabrass*, 469

F. Supp. 323, 329 (S.D.N.Y. 1978) (finding inventory search to include search of vehicle's

locked trunk).  Accordingly, I find that the shotgun and ammunition were seized pursuant to a

valid inventory search and recommend that Bartholomew's motion to suppress tangible evidence

be denied.


## CONCLUSION

For the foregoing reasons, it is my recommendation that Bartholomew's motions

to suppress tangible evidence seized from the Cadillac and statements made by him on January

30, 2004, **(Docket # 23)** be **DENIED**.


MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
    March  11  , 2005


18

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[8]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

Marian W Payson

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      March __11__, 2005

---

[8] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).